United States District Court
Southern District of Texas
Corpus Christi Division

United States District Court
Southern District of Texas
FILED

FEB 0 4 2000

Michael N. Milby, Clerk

MSJ Radio Corporation

vs.

Reina Broadcasting, Inc.

No. *C-00-49*
[Jury Requested]

# COMPLAINT AND APPLICATION TRO

## To the Honorable Court:

MSJ Radio Corporation ("MSJ") respectfully files suit against Reina Broadcasting, Inc.

### Jurisdiction

1. Federal Jurisdiction exists specifically under the Lanham Act.

### Defendant

2. Reina Broadcasting, Inc. ("Reina") may be served through its registered agent: Manuel Davila, Jr., 701 Benys Road, Corpus Christi, Texas 78465.

### Facts

3. Reina owns an FCC license for KBSO (94.7 FM in the Corpus Christi Market).

4. MSJ entered into a Local Marketing Agreement ("LMA") with Reina.

5. MSJ under the LMA has the right to operate KBSO for 5 years.

6. MSJ under the LMA also has the right to use various radio transmission facilities.

7. Further, MSJ under the LMA has an option to purchase Reina within 5 years.

8. MSJ under the LMA now pays $8,250 per month plus expenses defined by the LMA.

9. A significant disagreement has arisen over the amount of expenses due.

10. MSJ believes it has paid significantly more than the amount due under the LMA.

11. Reina refuses to document the expenses that he claims.

12. MSJ believes many expenses he claims are not its responsibility in full or part.

13. MSJ believes Reina has not actually paid some expenses that MSJ has "reimbursed."

14. MSJ has sought to resolve the dispute in a reasonable manner.

15. Reina instead of acting reasonable expelled MSJ from the radio transmission facility.

1

CNsPDF - www.fasiso.com

16. Specifically, Manuel Davila, Jr. said on Tuesday, February 1, 2000, at 4:15 P.M.:

> If you set foot on my property, I will call the police and have you
> arrested for trespassing.

17. Reina since February 1, 2000, at 4:15 p.m. has operated the radio station.

18. Reina has changed the format of the radio station.

19. MSJ is losing its audience because its audience does not like the new format.

20. Further, Reina is not playing advertising already sold by MSJ.

21. As a result, MSJ is in imminent danger of losing its advertisers. MSJ is also in imminent danger of losing its relationships with national and regional advertising agencies.

22. The bottom line is that MSJ in imminent danger of losing its entire business.

23. MSJ has invested hundreds of thousands of dollars in this LMA Agreement since its inception. If MSJ does not regain control of KBSO, all will be lost.

## Lanham Act

24. Reina has violated the Lanham Act by unlawfully using MSJ's tradenames

25. MSJ's tradenames are "The Big Rock Station" and variations and "KBSO."

26. This is causing confusion among advertisers and listeners.

27. The value of these tradenames is being damaged as MSJ loses listeners.

28. MSJ has targeted the 25-54 adult demographic.

29. Reina is playing music not completely consistent with this market.

30. Reina is playing music more designed for the 18-24 demographic.

31. Reina is playing music inconsistent with the advertising sold by MSJ.

32. Reina is playing music inconsistent with the market developed by MSJ.

33. MSJ has suffered and is suffering damages.

34. MSJ is entitled to all damages available under the Lanham Act.

35. MSJ is entitled to attorneys' fees.

## Breach of Contract

36. Reina has breached the LMA agreement by taking control of the KBSO.

37. Reina has also breached the LMA agreement by demanding expenses not owed.

38. MSJ is entitled to recover its actual damages and attorneys' fees.

2

### Fraud

39. Reina defrauded MSJ by representing that expenses were owed when not owed.

40. MSJ paid these expenses in reliance on Reina's false representations.

41. MSJ has suffered damages from $18,000 to $60,000.

42. Reina acted with culpability sufficient for exemplary damages.

43. MSJ is entitled to recover actual damages and exemplary damages.

44. No cap exists on exemplary damages because Reina engaged in "theft" or other relevant criminal conduct. Reina has been granted radio licenses worth millions of dollars.

### Declaratory Judgment

45. A dispute exists over the amount of expenses owed under the LMA agreement. The Court should grant declaratory judgment on the relative rights of the parties. MSJ is entitled to recover attorneys' fees for obtaining declaratory judgment.

### Conversion

46. Reina has physical access to MSJ's mail. Reina regularly opens and inspects MSJ's mail. Reina has in the past has converted MSJ checks.

47. An imminent risk exists of conversion of additional checks. Reina has acted with culpability sufficient for exemplary damages. MSJ is entitled to actual and exemplary damages.

### Wrongful Eviction

48. Reina wrongfully evicted MSJ from the transmission facility. Reina acted with culpability sufficient for exemplary damages. MSJ is entitled to actual and exemplary damages.

### Conditions Precedent

49. All conditions precedent have been performed or have occurred.

### Temporary Restraining Order

50. MSJ is in imminent danger of losing its entire business including its listeners, advertisers, and investors. All equities favor MSJ. The Court should preserve the status quo. The issue of who is correct on the expenses can be litigated in due course. MSJ is capable and will make sufficient bond to protect Reina. The bond should equal the amount in controversy.

51. The Temporary Restraining Order should bar Reina from excluding MSJ from the transmission facility and should order him to not interfere with MSJ's mail and should order him to not interfere with the operation of MSJ's business.

52. MSJ will suffer irreparable injury and loss if its application for temporary restraining order is not heard immediately before notice to Reina. MSJ has not had control of its station now for over 72 hours. Reina has no local attorney. Reina does have an attorney in California. Reina attorney in California is Christopher Blaxland, P.O. Box 4018, Palos Verdes Peninsula, California 90274. Telephone (310) 937-7270. Telecopier (310) 798-0738.

53. David Sibley certifies that he faxed a copy of this document and the civil cover sheet to Christoper Blaxland immediately upon completion and immediately before filing. He intends to make a phone call to Christopher Blaxland immediately after filing.

54. MSJ was represented by Nathan Holzer at Jordan, Hyden, Womble, & Culbreath before hiring its present attorney. Many letters were exchanged between Mr. Holzer and Mr. Blaxland before filing of this lawsuit. No reason exists to believe that a phone call without a lawsuit would resolve this controversy. In fact, Manuel Davila said: "not under my attorneys' advice but under my own advice I'm kicking you off the property – go ahead file an injunction."

### **Preliminary Injunction**

55. The Court should grant a preliminary injunction upon notice and hearing.

### **Conclusions**

56. The Court should grant a preliminary restraining order and a preliminary injunction.

57. The Court should grant all damages requested above.

**Respectfully Submitted,**

**David A. Sibley**
**Attorney At Law**
P.O. Box 9610
Corpus Christi, Texas 78469-9610
(361) 993-5585 — Telephone
(888) 248-1673 — Telecopier
State Bar No. 18337600
Federal I.D. 10053
ATTORNEY-IN-CHARGE FOR **MSJ**

4

United States District Court
Southern District of Texas
Corpus Christi Division

MSJ Radio Corporation

vs.

Reina Broadcasting, Inc.

No. _____
[Jury Requested]

# AFFIDAVIT OF JANIE WALKER

STATE OF TEXAS
COUNTY OF NUECES

     BEFORE ME, the undersigned authority, on this day personally appeared Janie Walker and states under oath as follows: My name is Janie Walker. I am over 18 years of age and fully competent. I have read the attached Complaint and Application for Temporary Restraining Order and Preliminary Injunction. All factual statements in the attached document are true within my personal knowledge. However, I did not personally hear the eviction and the threat to call the police.

Janie Walker, President of MSJ Radio Corp.

     SUBSCRIBED AND SWORN TO BEFORE ME, on this 4th day of February 2000, to certify which witness my hand and official seal.

Notary Public in and for the
State of Texas





GERTIE CONNER
MY COMMISSION EXPIRES
August 10, 2002

5

United States District Court
Southern District of Texas
Corpus Christi Division

MSJ Radio Corporation

vs.

Reina Broadcasting, Inc.

No. _____
[Jury Requested]

# AFFIDAVIT OF HENRY TURNER

STATE OF TEXAS
COUNTY OF NUECES

BEFORE ME, the undersigned authority, on this day personally appeared Henry Turner and states under oath as follows: My name is Henry Turner. I am over 18 years of age and fully competent. I have read the attached Complaint and Application for Temporary Restraining Order and Preliminary Injunction. All factual statements in the attached document are true within my personal knowledge.

Henry Turner

SUBSCRIBED AND SWORN TO BEFORE ME, on this _4th_ day of _February_ 2000, to certify which witness my hand and official seal.

Notary Public in and for the
State of Texas

GERTIE CONNER
MY COMMISSION EXPIRES
August 10, 2002

1

Case 2:00-cv-00049   Document 1   Filed in TXSD on 02/04/2000   Page 7 of 22

# LOCAL MARKETING AGREEMENT

This LOCAL MARKETING AGREEMENT (this "Agreement") is entered into this ___ day of _6/9/98_, 1998, by and between **AM Broadcasting, Inc.**, a Texas corporation ("Programmer") and **Reina Broadcasting, Inc.**, a Texas corporation ("Licensee").

## WITNESSETH:

WHEREAS, Licensee holds a license from the Federal Communications Commission ("FCC" or "Commission") authorizing it to operate KBSO(FM), Corpus Christi, Texas (the "Station");

WHEREAS, Licensee is engaged in the business of radio broadcasting on the Station, and has available for sale broadcast time on the Station;

WHEREAS, pursuant to an Option Agreement dated as of _6/19/98_, 1998, Programmer has obtained the right to exercise an option to purchase the assets of Licensee;

WHEREAS, Programmer is experienced in programming radio stations;

WHEREAS, during the term of this Agreement, Licensee wishes to retain Programmer to provide programming and related services for the Station, all in conformity with Station policies and procedures, FCC rules and policies for local marketing agreements, and the provisions hereof;

WHEREAS, Programmer agrees to use the Station to broadcast such programming of its selection that is in conformity with all rules, regulations and policies of the FCC, subject to licensee's full authority to manage and control the operation of the Station; and

WHEREAS, Programmer and Licensee agree to cooperate to make this Agreement work to the benefit of the public and both parties and as contemplated by the terms set forth herein.

WHEREAS, Programmer desires to purchase time on the Station for the broadcast of programming on the Station and to sell all of the commercial advertising time inventory of the Station.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1.    Time Sale.

Subject to the provisions of this Agreement, from and after the Commencement Date set forth in Paragraph 3 below, Licensee agrees to make the Station's broadcasting transmission facilities available to Programmer for broadcast of Programmer's programs on the

Station originating from Licensee's studios. The risk of loss with respect to the broadcasting transmission facilities will remain with Licensee. The Station's time made available to Programmer is described in Exhibit A hereto. Programmer will use its best efforts to provide programming which fills the Station's time made available hereunder.

2.    Payments.

Programmer hereby agrees to pay Licensee compensation for the broadcast of Programmer's programming in the amounts and at the times set forth in Exhibit B hereto.

3.    Term.

The term of this Agreement shall commence on 6|15|98 , 1998, at 1 :00 A Eastern Standard Time ("Commencement Date") and shall continue until (a) five (5) years from the Commencement Date; or (b) the date of closing of the sale of the Assets of the Station (the "Closing") contemplated by the Option Agreement and the draft Asset Purchase Agreement between Programmer and Licensee; or (c) the termination of the Asset Purchase Agreement in accordance with its terms, whichever is earlier.

4.    Programs.

Programmer shall furnish or cause to be furnished the artistic personnel and materials for its programming. Programmer represents and warrants that all of the programming, advertising and promotional material it broadcasts on the Station shall be in accordance with the rules, regulations, policies and procedures of the Commission and the Communications Act of 1934, as amended (the "Communications Act"), and the reasonable standards established by Licensee.

5.    Accounts Receivable.

(a)    Following the Commencement Date, Programmer shall be required to run spots sold by Licensee prior to the Commencement Date but to be broadcast after the Commencement Date and to assume air time trade payables for air time traded by Licensee prior to the Commencement Date.

(b)    For a term of one hundred twenty (120) days following the Commencement Date, Programmer, as Licensee's agent, shall collect all accounts receivable from Licensee's sale of time on the Station prior to the Commencement Date of this Agreement. Programmer's obligation with respect to collection of Licensee's accounts receivable will be to use such efforts in collecting such accounts as Programmer uses to collect its own accounts receivable, without compensation, but in no event will Programmer be obligated to institute suit, retain a collection agency, or institute any other extraordinary means of collection to collect Licensee's accounts receivable. Promptly upon signing this Agreement, Licensee shall furnish to Programmer a statement listing all such accounts receivable, which shall include the name of each account debtor, the balance due therefrom, the invoices and invoice dates which compose

Case 2:00-cv-00049  Document 1  Filed in TXSD on 02/04/2000  Page 9 of 22

-3-

such balance, the aging of each such account, and a description of any disputes regarding each such account of which Licensee is aware. For the purpose of determining amounts collected by Programmer with respect to the accounts receivable as provided herein:

(i)     in the absence of a _bona fide_ dispute between an account debtor and Licensee, all payments by an account debtor shall first be applied to accounts receivable of Licensee due from that account debtor; and

(ii)    in the presence of a _bona fide_ dispute between an account debtor and Licensee, any amount received by Programmer shall first be applied to any accounts receivable of Programmer due from that account debtor.

6.      Station Facilities.

(a)     Licensee Responsibility. During the term of this Agreement, Programmer shall be responsible for those expenses of the Station described in Paragraph 8 of this Agreement and shall reimburse the Licensee for those expenses described in Exhibit B. Licensee shall be responsible for, and pay in a timely manner, all capital and operating expenses associated with owning and controlling the Station during the term of this Agreement except to the extent that such operating expenses have been assumed by Programmer hereunder in a manner consistent with the rules, regulations, and policies of the FCC. Licensee shall be responsible for the Station's compliance with all applicable provisions of the Communications Act, the rules, regulations, policies and procedures of the FCC, and all other applicable laws. Licensee shall make its transmitter, transmitter building and tower site available to Programmer, at no additional charge, for the placement and use of broadcast equipment Programmer reasonably deems necessary to fulfill its responsibilities under this Agreement.

(b)     Mobile Facility. During the term of this Agreement, Programmer agrees to locate a mobile facility on the Station main studio site that will be used for sales purposes, and will be responsible for paying all maintenance and operating costs for this facility.

(c)     Maintenance. Licensee shall maintain the ability to operate its maximum authorized facilities at all times. Any maintenance work, other than emergency repairs which prevent the operation of the Station at full power and maximum facility, shall not be scheduled without giving at least forty-eight (48) hours notice to Programmer, unless Programmer waives such notice.

7.      Handling Of Mail And Complaints.

Programmer shall promptly forward to Licensee any mail which it may receive from any agency of government or any correspondence from members of the public relating to the Station or to any of Programmer's programming broadcast on the Station.

8.   <u>Responsibility For Employees And Expenses</u>.

a.   <u>Employees</u>   Licensee shall retain sufficient employees to meet all governmental requirements for staffing of its main studio including, but not limited to, a General Manager who shall direct the day-to-day operation of the Station, and a Chief Operator as that term is defined by the rules and regulations of the FCC (who may also hold the position of Chief Engineer) who shall be responsible for insuring compliance by the Station with the technical operating and reporting requirements established by the FCC. At least two employees of Licensee shall report to the Station's main studio each business day as their principal place of business, and at least one of those employees shall be physically present at the Station's main studio during all normal business hours as long as FCC rules or policies require such staffing. Licensee shall be responsible for insuring that qualified control operators monitor and control the Station's transmissions at all time, in full conformity with FCC requirements. Programmer will cooperate with Licensee in insuring that qualified control operators are available for such monitoring and controlling of station operations.

b.   <u>Benefits</u>   Programmer shall employ and be responsible for the salaries, commissions, taxes, insurance, vacation, sick leave and all other related costs for all employees referenced in Paragraph 8(a) above, together with any other employees, agents, contractors and personnel of Programmer involved in the production and broadcast of its programming, including air personalities, salespersons, sales representatives, consultants, traffic personnel, board operators and other programming staff members. During the term of this Agreement, Programmer shall enroll all employees assigned to it by Licensee under Paragraph 8(a) above in such group medical, group insurance and/or pension plans as Programmer customarily enrolls its employees.

c.   <u>Expenses.</u>   During the term of this Agreement, Programmer shall pay directly on a current basis licensing fees required to be paid to ASCAP, BMI and SESAC, and any other copyright or programming rights fees attributable to programming broadcast on the Station by Programmer during the term of this Agreement. Upon execution of this Agreement, Programmer shall apply promptly to ASCAP, BMI and SESAC for the necessary licenses and permits for Programmer to provide programming in its own name over the Station during the term of this Agreement. Beginning on the Commencement Date, Programmer will pay directly on a current basis to third parties on behalf of Licensee other fees and payments relating to the period of the term of this Agreement which are due and payable by Licensee as set forth in Exhibit C. Programmer is to be entitled to the benefit of all trade available and outstanding as of the Commencement Date under any Trade-Out Agreements performed after the Commencement Date.

9.   <u>Advertising And Programming Revenues</u>.

Programmer shall retain all revenues from the sale of advertising time on the programming it broadcasts on the Station. Programmer will provide, make available to and shall sell time to political candidates from the time it purchases from Licensee in strict compliance with the Communications Act, the rules, regulations, policies and procedures of the Commission.

CSHPDF - www.fedez.com

Programmer shall make available such records as are necessary for Licensee to ensure compliance with the political broadcasting rules and policies, and other rules and policies of the FCC.

10.    Operation Of Station.

Notwithstanding anything to the contrary in this Agreement, Licensee shall have full authority and power over the operation of the Station during the term of this Agreement. Licensee shall be responsible for all programming it furnishes for broadcast on the Station and for the payment of the salaries of all of its employees, all of whom shall report solely to and be accountable solely to the Licensee. The Licensee's General Manager shall direct the day-to-day operation of the Station, and the Licensee's Chief Operator shall oversee and direct the engineering and technical operation of the Station. Licensee shall retain the right to interrupt and discontinue Programmer's programming at any time if Licensee determines the programming is not in the public interest or violates this Agreement, or in case of an emergency or EAS system activation, or for the purpose of providing programming which Licensee in its sole discretion determines to be of greater national, regional or local importance, whereupon, the payments, reimbursements and fees provided for by paragraph 1 of Exhibit B hereof shall be reduced by a percentage amount equal to the percentage that the amount of Programmer's programming that is not carried bears to the total programming time allowed Programmer pursuant to Exhibit A hereof. Programmer shall properly prepare and promptly provide to Licensee (a) all its contracts, agreements and requests for time for political programming or programming addressing controversial issues of public importance; (b) all records, complaints and reports of every kind whatsoever which may be required by the FCC to be maintained or filed with the FCC by the Station as a result of Programmer's programming over the Station; and (c) full information with respect to Programmer's programs and public service announcements which are responsive to issues of public concern in sufficient detail to enable Licensee to timely prepare all appropriate or necessary records and reports required by the Commission and its rules and policies concerning the Station' operations. Programmer will properly prepare and furnish to Licensee such information, records and reports relating to Programmer's programming, sales or employment practices at the Station in sufficient detail as is necessary to enable Licensee to comply with all rules and policies of the FCC or any other government agency.

11.    Station Identification.

Licensee will be responsible for ensuring the proper broadcast of Station identification announcements. However, Programmer will provide appropriate Station identification announcements which comply with FCC requirements in a form acceptable to Licensee.

12.    Right To Use The Programs.

The right to use Programmer's programs and to authorize their use in any manner and in any media whatsoever shall be, and remain, vested in Programmer.

CSHPDF - www.testo.com

13.    Payola/Plugola.

Programmer agrees that neither it nor its agents, employees, consultants or personnel will accept any consideration, compensation, gift or gratuity of any kind whatsoever, regardless of its value or form, including, but not limited to, a commission, discount, bonus, material, supplies or other merchandise, services or labor (collectively "Consideration"), whether or not pursuant to written contracts or agreements between Programmer and merchants or advertisers, unless the payer is identified in the program for which Consideration was provided as having paid for or furnished such Consideration, in accordance with the Communications Act and FCC requirements.

14.    Compliance With Law.

Programmer agrees that, throughout the term of this Agreement, Programmer will comply with all laws, rules, regulations, policies and procedures including, but not limited to, the FCC's technical, political broadcasting, obscenity and indecency regulations, fair trade practice regulations, lottery broadcast regulations, sponsorship identification rules, sales practice regulations, applicable to the operations of the Station, and all FCC rules applicable to programming agreements of this kind. Programmer acknowledges that Licensee has not urged, advised or consented to or agreed in any way whatsoever to the use of any unfair business practice.

15.    Indemnification.

(a)    Programmer's Indemnification.  Programmer shall indemnify and hold Licensee harmless for any material loss, damage or injury of any kind sustained by Licensee resulting from Programmer's breach of this Agreement, from any programming material broadcast by Programmer on the Station, from the sale of or attempt by Programmer to sell advertising or program time on the Station, and from any material act or omission of any kind whatsoever by Programmer.

(b)    Licensee's Indemnification.  Licensee shall indemnify and hold Programmer harmless for any material loss, damage or injury of any kind sustained by Programmer resulting from Licensee's breach of this Agreement, from the broadcast of programming on the Station furnished by Licensee, from the sale of or attempt by Licensee to sell advertising or program time on the Station (except the instant sale provided for in this Agreement to Programmer), and from any material act or omission of any kind whatsoever by Licensee.

(c)    Survival.  Neither Licensee nor Programmer shall be entitled to indemnification pursuant to this section unless such claim for indemnification is asserted in writing delivered to the other party.  The representations and covenants of Licensee and Programmer and their obligation to indemnify and hold each other harmless as set forth in this Agreement shall survive any termination, and shall continue for a period of six months after the termination of this Agreement as to the parties hereto and to claims of third parties.

16.   Termination And Remedies Upon Default.

(a)   Termination. In addition to other remedies available at law or equity, this Agreement may be terminated as set forth below by either Licensee or Programmer by written notice to the other if the party seeking to terminate is not then in material default or breach thereof, upon the occurrence of any of the following:

(i)   This Agreement is declared invalid or illegal in whole or material part by an order or decree of the FCC or any other administrative agency or court of competent jurisdiction, including but not limited to U.S. Bankruptcy Court, and such order or decree has become final and no longer subject to further administrative or judicial review;

(ii)   The other party is in material breach of its obligations hereunder and has failed to cure such breach within thirty (30) days of notice from the nonbreaching party;

(iii)   The mutual consent of both parties;

(iv)   There has been a change in FCC rules, policies or case law precedent that would cause this Agreement or any provision thereof to be in violation thereof and such change is not the subject of an appeal or further administrative review.

Upon termination of this Agreement according to the provisions of this paragraph, the payments, reimbursements and fees provided for hereunder shall be prorated to the effective date of termination. Licensee shall cooperate reasonably with the Programmer to the extent permitted to enable Programmer to fulfill advertising or other programming contracts then outstanding, in which event Licensee shall receive as compensation for the carriage of such advertising or programming that which otherwise would have been paid to Programmer hereunder.

(b)   Programmer's Additional Remedies for Licensee's Technical Operation Deficiencies. In addition to Programmer's right to terminate for reasons set forth in Paragraph (a) above, if the Station suffers any damage to its transmission facilities which results in the inability of the Station to operate with its presently authorized facilities and Licensee has not restored full-time operation of the Station with its presently authorized facilities within fourteen (14) days of such occurrence, Programmer may give notice to Licensee of Programmer's termination of this Agreement, in which event this Agreement shall terminate upon the giving of such notice, any other provision of this Agreement notwithstanding. For each day that the Station is not operating at authorized facilities, the payments due pursuant to Exhibit B hereof shall be reduced to a percentage amount equal to the percentage that the amount of time of reduced power operation bears to the number of hours Programmer may broadcast pursuant to Exhibit A hereof.

(c)   Programmer's Additional Termination Rights. Notwithstanding anything herein to the contrary and in addition to Programmer's termination rights in Paragraphs (a) and (b) above, Programmer shall have the right to terminate this Agreement (i) upon the event that Licensee makes a general assignment for the benefit of creditors, files or has filed against it a petition for bankruptcy, reorganization or an arrangement for the benefit of creditors, or for the

appointment of a receiver, trustee or similar creditors' representative for the property or assets of Licensee under any federal or state insolvency law, which if filed against Licensee, has not been dismissed within sixty (60) days thereof, or (ii) upon termination of the Asset Purchase Agreement, whereby the Closing contemplated in the Asset Purchase Agreement will not occur.

     (d)   <u>Licensee's Additional Termination Rights</u>. Notwithstanding anything herein to the contrary and in addition to Licensee's termination rights in Paragraph (a) above. Licensee shall have the right to terminate this Agreement (i) upon the event that Programmer makes a general assignment for the benefit of creditors, files or has filed against it a petition for bankruptcy, reorganization or an arrangement for the benefit of creditors, or for the appointment of a receiver, trustee or similar creditors' representative for the property or assets of Programmer under any federal or state insolvency law, which if filed against Programmer, has not been dismissed within sixty (60) days thereof, or (ii) upon termination of the Asset Purchase Agreement, whereby the Closing contemplated in the Asset Purchase Agreement will not occur.

17.   <u>Force Majeure</u>.

    Any failure or impairment of facilities or any delay or interruption in broadcast programming, or failure at any time to furnish facilities, in whole or in part, for broadcasting, due to any Act of God, strikes or threats thereof or force majeure or due to any other causes beyond the reasonable control of Licensee or Programmer shall not constitute a breach of this Agreement, and Licensee or Programmer, as the case may be, will not be liable to the other party hereto therefore, provided such party uses reasonable diligence to correct such failure or impairment as soon as is reasonably possible; <u>provided, however,</u> that Programmer's failure to sell airtime or deliver programming or commercial matter on account of any of the foregoing circumstances shall not release Programmer from its obligation to make the payments required in Exhibit B hereof during the term of this Agreement.

18.   <u>Notices</u>.

    All notices and other communications permitted or required under this Agreement shall be in writing and shall be deemed effectively given or delivered upon personal delivery or twenty-four (24) hours after delivery to a courier service which guarantees overnight delivery or five (5) days after deposit with the U.S. Post Office, by registered or certified mail, postage prepaid, and, in the case of courier or mail delivery, addressed as follows (or at such other address for a party as shall be specified by like notice):

        To Licensee:       Reina Broadcasting, Inc.
                           P.O. Box 5278
                           Corpus Christi, Texas 78465-5278
                           ATTN: Mr. Manuel Davila, Jr., President
                           Telephone: (512) 289-0999
                           Telecopier: (512) 289-6215

| To Programmer: | AM Broadcasting, Inc.<br>2745 Alvin Road<br>Corpus Christi, Texas 78415<br>ATTN: Mr. Michael Aradillas<br>Telephone: (512) 854-7125 |
|---|---|

19. <u>Modification and Waiver</u>.

No modification or waiver of any provision of this Agreement shall in any event be affected unless the same shall be in writing and signed by the party adversely affected by the waiver or modification, and then such waiver and consent shall be effective only in the specific instance and for the purpose for which given.

20. <u>Corporate Authority; Construction</u>.

The undersigned signatories to this Agreement personally represent and warrant that they have full authority to execute this Agreement on behalf of the respective parties. This Agreement shall be construed in accordance with the laws of the State of Texas, and the obligations of the parties hereto are subject to all federal, state and local laws and regulations now or hereafter in force and to the rules, regulations, policies and procedures of the Commission and all other government entities or authorities presently or hereafter to be constituted.

21. <u>Headings</u>.

The headings contained in this Agreement are included for convenience only and no such heading shall in any way alter the meaning of any provision.

22. <u>Counterpart Signatures</u>.

This Agreement may be signed in counterpart originals, which collectively shall have the same legal effect as if all signatures had appeared on the same physical document. This Agreement may be signed and exchanged by facsimile transmission, with the same legal effect as if the signatures had appeared in original handwriting on the same physical document.

23. <u>No Partnership Or Joint Venture Credited</u>.

Programmer is acting as an independent contractor hereunder and nothing in this Agreement shall be construed to make Licensee and Programmer partners or joint venturers or to make Licensee or Programmer the agent of the other or to afford any rights to any third party other than as expressly provided herein. Programmer agrees not to hold itself out as being Licensee of the Station, and will provide reasonable notice to customers, listeners, and others with whom it does business of the fact that it is merely programming Station and, prior to the Closing of the Asset Purchase Agreement, has no ownership interest therein.

Case 2:00-cv-00049   Document 1   Filed in TXSD on 02/04/2000   Page 16 of 22

24.  <u>Assignment; Binding Agreement</u>.

Neither Programmer nor Licensee may assign this Agreement without the prior approval of the other party which shall not be unreasonably withheld or delayed except that Programmer, who shall remain primarily liable, may assign this agreement to an affiliate of Programmer upon written notification to Licensee. The party shall communicate its position on any proposed assignment within fourteen (14) days after receipt of written notice of the proposed assignment. Programmer may assign this Agreement to an entity controlled by AM without the prior approval of Licensee. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

25.  <u>Severability</u>.

In the event any term or provision of this Agreement is declared to be invalid or illegal for any reason, this Agreement shall remain in full force and effect and the same shall be interpreted as though such invalid and illegal provision were not a part hereof. The remaining provisions shall be construed to preserve the intent and purpose of this Agreement and the parties shall negotiate in good faith to modify the provisions held to be invalid or illegal to preserve each party's anticipated benefits thereunder.

26.  <u>Entire Agreement</u>.

This Agreement supersedes any prior agreements between the parties, and contains all of the terms agreed upon with respect to the subject matter hereof. This Agreement may not be altered or amended except by an instrument in writing signed by the party against whom enforcement of any such change is sought.

27.  <u>Certifications</u>.

Licensee hereby certifies that for the term of this Agreement it shall maintain ultimate control over the Station's facilities, including control over the Station's finances, personnel and programming, and nothing herein shall be interpreted as depriving Licensee of the power or right of such ultimate control.

Programmer hereby certifies that this Agreement complies with the restrictions on ownership of media set out in the Commission's rules and regulations.

CVisPDF - www.fesnio.com

-11-

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the day and year written above.

AM BROADCASTING, INC.

By: _____

Title: _PRESIDENT_____

REINA BROADCASTING, INC.

By: _____

Title: _____

# EXHIBIT A

## PROGRAMMING

Subject to all other provisions of this Agreement, Programmer will have the right to broadcast on the Station up to twenty-four (24) hours of programming each day during the term of this Agreement. Licensee reserves two (2) hours of the Station's time for its own use at a mutually agreeable time on Sunday morning.

## ASSIGNMENT OF LOCAL MARKETING AGREEMENT

Date:

LOCAL MARKETING AGREEMENT

Date:  June 9, 1998

Programmer:  A M Broadcasting, Inc., a Texas corporation

Licensee:  Reina Broadcasting, Inc., a Texas corporation

Station:  KBSO(FM), Corpus Christi, Texas


Assignor:  A M BROADCASTING, INC., a Texas corporation

Address :  701 Benys Road
           Corpus Christi, Texas 78401

Assignee:  MSJ RADIO CORPORATION, a Texas corporation

Address:   222 Chaparral Street
           Corpus Christi, Texas 78401

    For value received, Assignor transfer the Local Marketing Agreement to Assignee.  Assignee assumes all obligations of Assignor under the Local Marketing Agreement.

ASSIGNOR

By: _Janie Walker_

(Name typed): _JANIE WALKER_

Its: _Vice President_


ASSIGNEE

By: _Janie Walker_

(Name typed): _JANIE WALKER_

Its: _President_

(1)

## CONSENT OF LICENSEE

Licensee consents to the above assignment, as evidenced by the signature below of its proper officer.  Assignor is released of all obligations under the Local Marketing Agreement.

LICENSEE

By: _____

(Name typed): MANUEL DAVILA JR

Its: PRESIDENT

(2)

888-8707

## EXHIBIT B

### COMPENSATION PAYMENT SCHEDULE

1.      During each Month (as defined below) of the term of the Agreement, commencing on the Commencement Date, Programmer shall pay to Licensee a monthly sum of Seven Thousand Five Hundred Dollars ($7,500.00) for the first year of the Agreement, with an incremental addition of ~~$250.00~~ each year the Agreement is in effect, beginning on the anniversary of the Commencement Date. *$1,000.00* R&D *AMA*

2.      In addition, Programmer agrees to (i) reimburse Licensee for all the following verifiable, reasonable operating expenses of the Station: (A) the compensation of the Licensee's employees at the Station, as required to fulfill FCC main studio staffing requirements, and of the Licensee's employee or independent contractor serving as the engineer at the Station, in an amount not to exceed ~~in aggregate of~~ $ _____ per month, (B) the employee benefits and payroll taxes costs of such employees, (C) the utility costs for the operations of the Station's transmitter, and the reasonable repair and maintenance costs thereof, (D) the reasonable costs of Licensee's employee's office expenses, including office supplies, telephone and utility expenses, in an amount not to exceed $ _____ per month, and (E) the general property and casualty and general liability insurance costs related to the Station, such expenses being referred to as "Licensee's Operating Expenses" and such payment being referred to as the "Operating Expense Payment", and such reimbursement to be made in cash or by check within ten (10) business days after receipt by Programmer from Licensee of a written accounting (each, a "Monthly Expense Report") of Licensee's Operating Expenses for such Month. *#AMA*

3.      Should this Agreement terminate upon the sale of the Station to Programmer in accordance with Paragraph 3 herein, the final Operating Expense Payment and LMA Fee Payment will be made at the Closing.

4.      For the purposes of this Schedule, a "Month" means a ~~calendar~~ *fiscal* month. *16th* R&D *AMA*

5.      Licensee agrees to provide Programmer such records, receipts, copies of contracts and other information and documentation as Programmer may reasonably request in order to enable it to verify Licensee's Monthly Expense Reports.

LMDATA\USER\RBHAR\WPS1DOCS.MA\MAST\ B LMA

\* an amount agreed to by programmer R&D *AMA*

Case 2:00-cv-00049   Document 1   Filed in TXSD on 02/04/2000   Page 22 of 22

## ASSIGNMENT OF LOCAL MARKETING AGREEMENT

Date:

LOCAL MARKETING AGREEMENT

Date:  June 9, 1998

Programmer:  A M Broadcasting, Inc., a Texas corporation

Licensee:  Reina Broadcasting, Inc., a Texas corporation

Station:  KBSO(FM), Corpus Christi, Texas

Assignor:  A M BROADCASTING, INC., a Texas corporation

Address :  701 Benys Road
           Corpus Christi, Texas 78401

Assignee:  MSJ RADIO CORPORATION, a Texas corporation

Address·  222 Chaparral Street
          Corpus Christi, Texas 78401

   For value received, Assignor transfer the Local Marketing
Agreement to Assignee.  Assignee assumes all obligations of
Assignor under the Local Marketing Agreement.

### ASSIGNOR

By: _Janie Walker_
(Name typed): _JANIE WALKER_
Its: _Vice President_

### ASSIGNEE

By: _Janie Walker_
(Name typed): _JANIE WALKER_
Its: _President_

(1)